IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

UNITED STATES OF AMERICA

vs.  CASE NO.: 3:24-cr-116/MCR

FERNANDO CRUZ RUBIO

_____/

STATEMENT OF FACTS

The United States, by and through the United States Attorney for the Northern District of Florida, the United States Department of Justice, Environmental Crimes Section ("the government"), and the Defendant, Fernando Cruz Rubio, agree and stipulate that this Statement of Facts is a true and accurate statement of the Defendant's criminal conduct and that it provides a sufficient basis for the Defendant's plea of guilty to Count One of the Information in this case. At all times relevant to the Information:

1. The United States is part of an international regime which regulates marine pollution, including the discharge of oil from vessels at sea, known as the International Convention for the Prevention of Pollution from Ships, as modified by the Protocol of 1978 ("MARPOL"). MARPOL was enacted into United States law by the Act to Prevent Pollution from Ships ("APPS"), 33 U.S.C. § 1901, *et. seq.* The regulations promulgated under APPS apply to vessels operating under the authority

FILED IN OPEN COURT
12/20/24
CLERK, UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA

of a country other than the United States, while in the navigable waters of the United States or while at a port or terminal under the jurisdiction of the United States. 33 C.F.R. § 151.09(a)(5).

2. On large commercial vessels, bilge water accumulates in bilge wells, the bottommost part of the vessel. Bilge water, which consists of water from spills, leaks from piping and tanks, or from rain and waves, is typically contaminated with oil, oil residue, lubrication fluids, and other liquids that leak or drip from engines or pipes and hoses that run throughout the ship. Periodically this oily bilge water is pumped into the vessel's bilge holding tank. In order to maintain bilges at safe levels, bilge tanks and wells must be periodically emptied. This can be done in one of two ways: (1) bilge water can be discharged ashore to a waste reception facility: or (2) it may be pumped over the side of the vessel into the ocean after having been processed through an Oily Water Separator ("OWS"). Pursuant to MARPOL and APPS, bilge water may be discharged overboard into the ocean only if it contains 15 parts per million ("ppm") or less concentration of oil. The principal technology used to lower the oil content of oily bilge water is an OWS, which filters oil from water prior to discharge. An OWS includes an Oil Content Monitor which detects and prevents concentrations of oil in excess of 15 ppm from being discharged overboard.

3. Consistent with the requirements contained in MARPOL, regulations implementing APPS require that a ship of 400 gross tons and above

other than an oil tanker, maintain a record known as an Oil Record Book ("ORB") in which each discharge overboard or other disposal of bilge water that has accumulated in the machinery spaces must be recorded. 33 C.F.R. § 151.25(a) and (d). The ORB also must include entries concerning any emergency, accidental, or other exceptional discharges. 33 C.F.R. § 151.25(g). Discharges must be fully recorded, without delay, in the ORB by the person in charge of the operation. 33 C.F.R. § 151.25(h). Each completed operation must be signed by the person in charge of the operation, and each completed page of the ORB must also be signed by the master or other person having charge of the vessel. *Id.* The master or other person in charge of the vessel is responsible for maintaining the ORB. 33 C.F.R. § 151.25(j). The ORB must be maintained onboard the vessel for not less than three years and be readily available for inspection at all reasonable times. MARPOL, Annex I, Regulation 17; 33 C.F.R. § 151.25(i).

4. APPS makes it a crime for any person to knowingly violate MARPOL, APPS, or any regulation promulgated under APPS. 33 U.S.C. § 1908(a).

5. The United States Coast Guard ("Coast Guard"), an agency of the United States Department of Homeland Security, is charged with enforcing the laws of the United States and is empowered under 14 U.S.C. § 522(a) to board vessels and conduct inspections and investigations of potential violations of international and

United States law including MARPOL and APPS. In conducting inspections, commonly known as Port State Control examinations, Coast Guard personnel rely upon the statements of the vessel's crew, and vessel documents such as the ORB.

6. The *M/V Suhar* was a 7,602 gross ton foreign-flagged ocean-going bulk carrier specifically designed to haul cement. Day-to-day operation of the vessel was undertaken by Gremex Shipping S.A. de C.V. ("Gremex"), a Mexican-domiciled corporation, which operates as a ship management company with its principal office in Tampico, Mexico.

7. Gremex began operating the *M/V Suhar* on or about February 2021. The *M/V Suhar* primarily transported bulk cement from Tampico, Mexico, to Pensacola, Florida. The ship would then return to Tampico empty, where it was reloaded with cement for transport back to Pensacola. Between April 22, 2021, and August 25, 2024, the vessel made 46 separate port calls in the United States, 36 of which were to Pensacola.

8. Defendant is a Mexican national who resides in Veracruz, Mexico, and who has worked as a mariner for approximately 40 years. In 1999, Defendant was first licensed to serve as a Chief Engineer. Since his appointment, Defendant has worked routinely as a Chief Engineer on a variety of vessels.

9. Since approximately 2015, Defendant has served as a Chief Engineer on several vessels operated by Gremex. Beginning on March 10, 2021,

Defendant first began working aboard the *M/V Suhar*. At that time, Defendant was sent to Turkey (where Gremex took possession of the vessel on or about March 10, 2021) and was responsible for helping bring the vessel to the United States where it would be used to transport cement from Mexico to the United States. Between March 10, 2021, and August 25, 2023, Defendant served as the Chief Engineer aboard the *M/V Suhar* on three separate contracts (March 10, 2021, to August 3, 2021; June 4, 2022, to February 5, 2023; and May 31, 2023, to August 25, 2023), totaling approximately 15 months.

10. As Chief Engineer aboard the *M/V Suhar*, Defendant was head of the Engine Department, directly responsible for the control of all personnel assigned to the Department including subordinate engineers and oilers. As part of his responsibilities, he was responsible for taking whatever measures were necessary to prevent sea pollution when carrying out Engine Department operations with due regard and primary responsibility to ensure the safety of the vessel and her crew. To facilitate this, Gremex policy provided that all handling of bilge water waste was under his control, and he was specifically responsible for controlling the proper functioning of pollution prevention equipment including the vessel's OWS.

11. As Chief Engineer, Defendant also was responsible for recording entries within the vessel's ORB. When he was on board, the vessel's ORB was

kept in his cabin and entries were made by him. To comply with the requirements of MARPOL, Defendant would periodically bring the ORB to the vessel's master for his signature at the bottom of each completed page of the ORB. Additionally, when the vessel was arriving in port, Defendant would bring the completed ORB to the master for presentation to and review by port state officials upon request.

12. During his first voyage aboard the *M/V Suhar*, while sailing the vessel from Turkey to the United States, Defendant learned that the vessel's prior crew did not use the OWS because there was insufficient suction. Instead, the prior crew had been discharging oily bilge water waste directly into the sea. He learned that they did so by way of a hose that pumped bilge water from the Bilge Holding Tank ("BHT") to an overboard valve located on the deck of the vessel which was typically used to discharge oily bilge water waste to a shoreside waste reception facility. During the voyage from Turkey to the United States, Defendant knew that crew under his control discharged oily bilge water waste into the ocean in this manner on at least one occasion and knew that doing so was improper. The Defendant failed to record this discharge of oily bilge water waste in the vessel's ORB.

13. Subsequently, over the course of his time aboard the *M/V Suhar* in which he was responsible for the vessel's engine room operations, vessel crew continued to periodically discharge oily bilge water waste directly into the ocean

without being processed through the OWS. During his first two contracts aboard the vessel, discharges periodically occurred in the manner described above. On his final contract, the vessel's crew discharged oily bilge water waste in a different manner because the pump traditionally used to bypass the OWS and discharge overboard no longer worked. Instead, crew used a small Wilden pump to discharge oily bilge water waste overboard from the BHT through a sea chest valve.

14. Defendant knew that these discharges of oily bilge water waste were being made by members of the crew without using the OWS and the Defendant took no action to stop them. Further, the Defendant did not record any of these at-sea discharges in the ORB in order to conceal that they were occurring.

15. On August 10, 2023, the *M/V Suhar* arrived in Pensacola, where the vessel was boarded by Coast Guard personnel for the purpose of conducting a routine Port State Control inspection. Upon the vessel's arrival in Pensacola, Defendant provided the ORB to the master of the vessel. During the course of the Port State Control inspection, the Coast Guard reviewed the ORB, identified errors in how the ORB was prepared, and cited the vessel with failing to properly document entries within the ORB. Given the nature of the citation, the vessel was allowed to depart the United States with the expectation that the deficiencies would be corrected prior to the vessel's return.

16. On August 25, 2023, the *M/V Suhar* arrived in Pensacola where the vessel was again boarded by the Coast Guard. Again, upon the vessel's arrival at Pensacola, Defendant provided the ORB to the master of the vessel. During the course of that Coast Guard inspection, the master provided the ORB to the Coast Guard for review. Once again, the Coast Guard identified discrepancies within the ORB, which resulted in the vessel's detention.

## ELEMENTS OF THE OFFENSE

*Count 1:* Failure to Maintain an Oil Record Book in violation of the Act to Prevent Pollution from Ships. Title 33 U.S.C. § 1908(a), 18 U.S.C. § 2.

1. The *M/V Suhar* was a ship of 400 or more gross tons that was registered in a country other than the United States.
2. The Defendant was a person in charge of operations aboard the *M/V Suhar* that were required to be recorded in the vessel's Oil Record Book.
3. The Defendant willfully caused the master of the *M/V Suhar* to knowingly maintain an Oil Record Book that failed to accurately record all operations involving the discharge of oily mixtures and machinery space bilge water; and
4. The failure to maintain an accurate Oil Record Book occurred while the *M/V*

*Suhar* was in the navigable waters of the United States, or at a port or terminal under the jurisdiction of the United States.

_____
MICHAEL TWERSKY
Attorney for Defendant

12/20/24
Date

_____
FERNDANDO CRUZ RUBIO
Defendant

12/20/24
Date

JASON R. COODY
United States Attorney

_____
JOSEPH A. POUX, JR.
Deputy Chief - Environmental Crimes Section
United States Department of Justice
150 M. Street, NE, Suite 4.119
Washington, D.C. 20002
Joseph.Poux@usdoj.gov

_____
JASON R. COODY
United States Attorney
Kansas Bar No. 20805
United States Attorney's Office
Northern District of Florida
21 E. Garden Street, Suite 400
Pensacola, Florida 32502-5675
JCoody@usa.doj.gov

12/20/24
Date